## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| JOHN RINKER and ARTHUR H. SPEIER,     ) <br><br> on Behalf of Themselves and All Others     ) <br> Similarly Situated,     ) <br>                         Plaintiff,     ) <br>     ) <br>        vs.     ) <br>     ) <br> DUNCAN ENERGY PARTNERS L.P.,     ) <br> W. RANDAL FOWLER, BRYAN F. BULAWA,     ) <br> WILLIAM A. BRUCKMANN, III,     ) <br> LARRY J. CASEY, RICHARD S. SNELL,     ) <br> DEP HOLDINGS, LLC and ENTERPRISE     ) <br> PRODUCTS PARTNERS L.P.,     ) <br>                 Defendants.     ) | NO. _____ <br><br> __CLASS ACTION__ <br><br><br><br> __DEMAND FOR JURY TRIAL__ |

### COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
### AND BREACH OF EXPRESS AND IMPLIED CONTRACTUAL DUTIES

### INTRODUCTION

1.      This is a class action brought by Plaintiffs, John Rinker and Arthur H. Speier, individually and on behalf of a class of similarly situated persons and entities, all being unitholders of Duncan Energy Partners L.P. ("Duncan Energy" or the "Company") against Duncan Energy, DEP Holdings, LLC ("DEP"), Enterprise Products Partners L.P. ("Enterprise"), and the individual members ("Individual Defendants") of DEP's Board of Directors (the "DEP Board") arising out of their violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act" or the "1934 Exchange Act")  and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, as well as Defendants' breach and/or aiding of other Defendants' breaches of the express and implied contractual obligations under Duncan

Energy's Amended and Restated Agreement of Limited Partnership (the "LPA"), dated February 5, 2007. [1] These violations and breaches arise out of the April 28, 2011 Agreement and Plan of Merger ("Merger Agreement"), whereby Defendants agreed to sell Duncan Energy to Enterprise with an exchange ratio placing the value of the Company at approximately $2.5 billion ("the Proposed Acquisition").

## SUMMARY OF THE ACTION

2.      Dan L. Duncan founded Enterprise in 1968. On February 5, 2007, Duncan Energy spun-off from Enterprise and went public. Duncan Energy gathers, transports, stores, and markets natural gas, as well as transports and stores both natural gas liquids ("NGL" or "NGLs") and petrochemicals domestically. Currently there are around 11,000 miles worth of both natural gas and NGL pipeline interests controlled by Duncan. Seeing Duncan's recent financial success and promise for future growth, Enterprise is attempting, via the Proposed Acquisition, to obtain the Company through unfair means for an unfair price. Since 2009 Enterprise has been attempting to acquire Dan Duncan's former companies, starting with the TEPPCO Partners L.P. merger that created an energy partnership worth $30 billion. Enterprise continued its expansion in 2010, buying out its general partner, Enterprise GP Holdings L.P., for $9 billion. Furthering its goal at consolidation and 100% control over Duncan, Enterprise is now attempting to obtain the outstanding stakes in Duncan Energy through the Proposed Acquisition.

3.      On February 23, 2011, the Company announced in a press release that Enterprise had made an offer to obtain Duncan Energy ("Initial Offer"). At this time it was assumed that the terms of the Initial Offer would not change and that the deal would be finalized based on the fact

---

[1] The "Individual Defendants" in this case are W. Randall Fowler ("Fowler"), Bryan F. Bulawa ("Bulawa"), William A. Bruckmann, III ("Bruckmann"), Larry J. Casey ("Casey"), and Richard S. Snell ("Snell"). The "Defendants" referred to in this case are Duncan Energy, DEP, Enterprise, and the Individual Defendants collectively.

that Enterprise is a majority stake holder of 58% of common units of Duncan's stock and DEP, Duncan Energy's general partner, is a wholly owned subsidiary of Enterprise. Additionally the directors of both DEP and Enterprise have overlapping conflicts of interest. For example, Fowler is the Executive Vice President ("EVP") and Chief Financial Officer ("CFO") for Enterprise's general partner, Enterprise Products Holdings LLC ("Enterprise GP"), while also holding the post as DEP's Chief Executive Officer ("CEO") and President.

4.       The Proposed Acquisition was first publicized in a press release on April 29, 2011. The terms of the Proposed Acquisition stipulate that for each of Duncan Energy common units ("Duncan units"), Duncan Energy unitholders would receive 1.010 Enterprise common units ("Enterprise Units"). Duncan Energy unitholders would receive approximately $43.82 per Duncan Energy Unit ("Proposed Consideration"), equating to only a 7.56% premium over $40.74, Duncan's closing price on April 28, 2011. Furtherance of the Proposed Acquisition will legitimize an unfair and underhanded sales process, while depriving Duncan Energy unitholders of adequate consideration for their investments.

5.       Through the pursuit and agreement to the Proposed Acquisition, Defendants breached and/or aided in the breach of the express and implied contractual duties by other Defendants, under the terms of the LPA. The LPA explicitly stipulates that any agreement entered into, such as the Proposed Acquisition, be "fair and reasonable." Plaintiffs, and others similarly situated, are owed an implied duty of good faith and fair dealing under the terms of the LPA and implied in each and every contract is also the covenant of good faith and fair dealing. Furthermore, the Delaware Revised Uniform Limited Partnership Act ("DRULPA") prohibits the elimination of this covenant within limited partnership agreements, such as the LPA.

6.     Regardless of these restrictions, Defendants breached their implied and express contractual duties in agreeing to the Proposed Consideration without fair and adequate consideration: (a) in their failure to shop the Company adequately; (b) in stipulating in the Merger Agreement to a no-solicitation provision; (c) in agreeing to a preclusive deal protection device, and (d) in approving and pursuing the Proposed Acquisition regardless of the numerous conflicts of interest. "Special Approval" immunization provisions within the LPA, which otherwise would shield the Defendants from liability, are inapplicable to Defendants in this case due to the numerous conflicts of interest. It is evident that Defendants acted in concert without regard to the interests of Duncan Energy unitholders, or in the best interest of the Company. Without court intervention it is apparent that Plaintiffs and the Class shall suffer irreparable injury that immediately warrants injunctive relief.

7.     On May 18, 2011, Defendants filed a materially false and misleading Form S-4 (the "S-4") with the SEC. This filing sought to gain the approval of Duncan unitholders for the Proposed Acquisition. Although the S-4 seeks to gain the approval of Duncan's unitholders, the Form is materially misleading and omits key information needed for the unitholders to be adequately educated prior to the vote, concerning: (a) Duncan's financial forecasts; and (b) important assumptions and input data used in the fairness opinion drafted by Morgan Stanley & Co. Incorporated ("Morgan Stanley"), Duncan's Audit, Conflicts and Governance Committee's ("Duncan ACG Committee") financial advisor.

8.     As a result of the materially misleading and false Form S-4 filed on May 18, 2011, Defendants violated §§14(a) and 20(a) of the 1934 Exchange Act. It was these material misrepresentations and omissions from the Form S-4 that are necessary for the Duncan Energy unitholders to make an informed decision on whether they will vote in favor or against the

Proposed Acquisition. The Defendants' violations of the 1934 Act threaten irreparable harm to the unitholders, which monetary damages would be an inadequate remedy at law. For these reasons Plaintiffs seek injunctive relief in order to enjoin the Defendants' finalization of the Proposed Acquisition, until at which time Defendants fulfill their duties by providing Duncan Energy unitholders with a complete informational sheet on the Company's true financial forecasts, assumptions, and input data used for the fairness opinion drafted by Morgan Stanley.

## JURISDICTION AND VENUE

9.      Jurisdiction is conferred by Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") and 28 U.S.C. §1331. The claims asserted herein arise under Section 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (i) Duncan has its principle place of business here; (ii) a substantial portion of the actionable conduct occurred here; (iii)   Plaintiffs' claims arose here; (iv) most of the documents are stored electronically here; (v) evident exists here; (vi) a majority of the witnesses who are available to testify are located here; and (vii) the Individual Defendants, officers, and/or directors, each have extensive contacts within this District.

## PARTIES

11.     Plaintiff, John Rinker, has been a Duncan Energy unitholder at all relevant times hereto, and continues to be a unitholder of Duncan Energy.

12.     Plaintiff, Arthur H. Speier, has been a Duncan Energy unitholder at all relevant times hereto, and continues to be a unitholder of Duncan Energy.

13.     Defendant Duncan Energy is a Delaware limited partnership that controls interests in natural resource assets located primarily in Texas and Louisiana. Duncan Energy is a

midstream energy servicer, who gathers, transports, stores, and markets natural gas. The Company also provide NGL separation, fractionation, transportation, and storage, as well as petrochemical storage and transport. Currently Duncan has assets of around 9,400 miles worth of natural gas pipelines interests, having a transportation capacity of approximately 7.9 billion cubic feet ("Bcf") per day. Duncan also has approximately 1,600 miles of pipeline for NGL and petrochemicals. The Company also has access to two NLG fractionation facilities in south Texas, one of the largest fractionation facilities in the world located in Mont Belvieu, Texas, about 18 million barrels ("MMBbls") of NGL leased storage capacity; 8.1 Bcf of natural gas lease storage capacity; and 34 salt dome caverns underground with approximately more than 100 MMBbls of NGL, as well as, more storage capacity located at Mont Belvieu. DEP, a wholly-owned subsidiary of Enterprise, manages Duncan Energy. With the completion of the Proposed Acquisition, Duncan Energy will be merged with EPD Merger Co LLC ("Merger Co"), a wholly owned subsidiary of Enterprise. The Company's principal executive offices are located at 1100 Louisiana Street, 10th Floor, Houston, Texas. The Company can be served via its Registered Agent: CT Corporation System, 350 N. Saint Paul St. Ste 2900 Dallas, Texas 75201.

14.     Defendant W. Randall Fowler is, and has been the President and CEO of DEP since April 2010, and has been a director at DEP since November 2010. In addition, Fowler is, and has been the EVP and CFO of Enterprise GP since August 2007. Fowler is, and has been the Vice Chairman and CFO of Enterprise Products Company ("EPCO"), which also owns significant equity interests in Duncan Energy and Enterprise, since May 2010 and as a director since December 2007. Fowler was also the EVP and CFO for DEP since August 2007 and Senior Vice President ("SVP") and Treasurer from October 2006 to August 2007. Fowler was EVP and CFO of Enterprise Products GP, LLC ("EPGP"), the former general partner of Enterprise, from

August 2007 to November 2010; a director of Enterprise GP from February 2006 to May 2010; and SVP and Treasurer of Enterprise GP from February 2005 to August 2007. Fowler was also EPE Holdings, LLC's ("EPE Holdings") SVP and CFO August 2005 to August 2007; EPCO's President and CEO from December 2007 to May 2010; and ECPO's CFO from April 2005 to December 2007. Fowler joined Enterprise as Director of Investor Relations in January 1999. Defendant Fowler can be served at 2218 Bluff Creek Dr., Kingwood, Texas 77345.

15.     Defendant Brian F. Bulawa is, and has been the SVP, CFO, and Treasurer at DEP since April 2010. In addition, Bulawa is, and has been a DEP director since February 2011. Bulawa is, and has been Enterprise GP's SVP and Treasurer since October 2009 and EPCO's SVP and Treasurer since May 2010. Bulawa was also DEP's SVP and Treasurer from October 2009 to April 2010; EPGP's SVP and Treasurer from October 2009 to November 2010; and EPGP's Vice President and Treasurer from July 2007 to October 2009. Defendant Bulawa can be served at 4 Forest Course Way, Kingwood, Texas 77339.

16.     Defendant William A. Bruckmann III is, and has been a DEP director since October 2006. Defendant Bruckmann can be served at 631 Ranger Lane, Longboat Key, Florida 34228.

17.     Defendant Larry J. Casey is, and has been a DEP director since October 2006. Defendant Casey can be served at 17415 Courtney Pine Cir., Spring, Texas 77379.

18.     Defendant Richard S. Snell is, and has been a DEP director since January 2010. Snell was also an EPGP director from June 2000 to February 2006. Defendant Snell can be served at 6207 Holly Springs Dr., Houston, Texas 77057.

19.     Defendant DEP is a Delaware limited liability company and a wholly-owned subsidiary of Enterprise. DEP is Duncan Energy's general partner and is responsible for

managing the business and operations of Duncan Energy. DEP owns 0.7 percent of Duncan Energy. Defendant DEP can be served via its Registered Agent: CT Corporation System, 350 N. Saint Paul St. Ste 2900 Dallas, Texas 75201.

20.     Defendant Enterprise is a Delaware limited partnership and a midstream energy company providing a variety of services to consumers and producers of natural gas, crude oil, NGLs, refined products, and a few petrochemicals. In addition, Enterprise is a leading developer of pipelines and other midstream energy transport infrastructure in the continental United States and Gulf of Mexico. Enterprise also beneficially owns 100% of DEP through its wholly-owned subsidiary Enterprise Products Operating LLC ("EPO") and the company controls approximately 58.5% of the outstanding common units of Duncan Energy through its affiliate Enterprise GTM Holdings, LP ("GTM"). Enterprise's principal executive offices are located at 1100 Louisiana Street, 10th Floor, Houston, Texas. Enterprise can be served via its Registered Agent: CT Corporation System, 350 N. Saint Paul St. Ste 2900 Dallas, Texas 75201.

## BACKGROUND

21.     Duncan Energy issued a press release on Tuesday, February 23, 2011 announcing the receipt of Enterprise's Initial Offer to purchase Duncan Energy. This release stated, in part:

> Duncan Energy Partners L.P. ("Duncan Energy Partners") (NYSE:DEP) today announced that the chairman of the Audit, Conflicts and Governance Committee of the board of directors of Duncan Energy Partners' general partner received a proposal from Enterprise Products Partners L.P. ("Enterprise") (NYSE:EPD) whereby Enterprise and certain affiliates would acquire all of the outstanding publicly-held common units of Duncan Energy Partners through a unit-for-unit exchange. Subject to the satisfactory negotiation and execution of definitive agreements, Enterprise is proposing consideration of 0.9545 Enterprise common units for each issued and outstanding publicly held Duncan Energy Partners common unit. The proposed transaction would be structured as a merger of Duncan Energy Partners with a wholly owned subsidiary of Enterprise. The consideration represents a value of $42.00 for each Duncan Energy Partners

8

common unit, or a premium of approximately 30 percent, based on the 10-day average closing price of Duncan Energy Partners common units and the closing price of Enterprise common units on February 18, 2011.

"We received Enterprise's merger proposal and will begin our review process," stated William A. Bruckmann, III, chairman of the Audit, Conflicts and Governance Committee of the board of directors of the general partner of Duncan Energy Partners.

Enterprise owns 100 percent of the general partner of Duncan Energy Partners and owns approximately 58 percent of the outstanding common units of Duncan Energy Partners.

22.     Disregarding the known fact that Enterprise would be submitting the Initial Offer shortly, it was not until after they issued the February 23, 2011 press release that Duncan Energy begin the process of soliciting Delaware counsel and/or a financial advising firm to assist in evaluating the terms of the Initial Offer. The Company finally chose legal and financial advising firms, Potter Anderson & Corroon, LLP ("Potter Anderson") on March 2, 2011 and Morgan Stanley on March 7, 2011, respectively.

23.     On March 9, 2011, Potter Anderson and Morgan Stanley met with the Duncan ACG Committee for the first time. The Duncan ACG Committee was the body delegated to determine the viability of the Enterprise transaction. The Duncan ACG Committee did not reconvene with its advisors again to discuss this transaction until March 28, 2011, at that meeting, however, they still failed to discuss the Initial Offer's fairness even though almost a month had elapsed since it had been received.

24.     It was only in the beginning of April 2011, that Duncan ACG Committee finally met with Morgan Stanley to discuss Enterprise's Initial Offer. At this meeting, the following issues were discussed: (1) the adequacy of the Proposed Consideration; and (2) Enterprise's stipulation that a sale of Duncan Energy or any of its assets to a third party would not be supported.

25.     On April 15, 2011, Duncan ACG Committee submitted a counteroffer to Enterprise in light of the issues discussed at the April meeting with Morgan Stanley.  The counteroffer stipulated that: (a) the exchange ratio increase from .9545 to 1.165 units of Enterprise for each unit of Duncan energy - - an increase of .2105 exchange ration units; and (b) an affirmative vote provision be included in the Merger Agreement, requiring an affirmative vote of the majority of Duncan's unitholders (not affiliated in anyway to Enterprise) to approve the Proposed Acquisition before it could be finalized and approved (the "Minority Approval Provision").

26.     Five days later, on April 20, 2011, Enterprise flatly rejected the counteroffer, including the adjusted exchange ratio and Minority Approval Provision, reasserting the terms contained in the Initial Offer.

27.     Duncan ACG Committee continued its attempts at negotiating with Enterprise to no avail and, by April 26, 2011, the Committee had dropped all of its demands agreeing to no Minority Approval Provisions and only a .0555 increase to the exchange ratio from the Initial Offer.

28.     On or about April 28, 2011, Morgan Stanley issued its fairness opinion and the Duncan ACG Committee came to a determination that the Proposed Acquisition was in Duncan Energy's and its common unitholders' best interests, and that it was a reasonable and fair agreement. In light of their determination, the Duncan Energy Board and Enterprise approved the Merger Agreement.

29.     On April 29, 2011, Duncan Energy issued a press release announcing that they had reached an agreement with Enterprise to sell the Company:

Enterprise Products Partners L.P. (NYSE:EPD) and Duncan Energy Partners L.P. (NYSE:DEP) today announced the execution of a definitive agreement that would

result in a merger whereby DEP would become a wholly-owned subsidiary of EPD's operating partnership through a unit-for-unit exchange. Under the terms of the definitive agreement, DEP unitholders would receive 1.01 EPD common units in exchange for each DEP common unit they own at closing, representing a premium of approximately 35 percent based on the closing price of DEP common units on February 22, 2011, the last trading day before EPD announced its initial proposal to acquire all of the common units of DEP owned by the public. Based on the cash distributions to be paid on May 6, 2011 by DEP and EPD, the merger would also result in a 32 percent increase in per unit cash distributions for the unitholders of DEP.

"We are pleased to announce our agreement to combine these two partnerships, in a transaction that would be immediately accretive to Enterprise's distributable cash flow per unit, simplify our commercial activities and organizational structure as well as lower our overall cost of financing, while at the same time providing an attractive premium to DEP's public unitholders," said Michael A. Creel, president and chief executive officer of EPD's general partner.

The merger is expected to provide benefits to current EPD unitholders by:

- being immediately accretive in terms of distributable cash flow per EPD common unit;

- simplifying EPD's commercial and organizational structure resulting from EPD's ownership of 100 percent of the equity interests in certain affiliates, which are now jointly owned with DEP, such as Acadian Gas LLC, Enterprise Texas, Enterprise GC and Mont Belvieu Caverns LLC;

- streamlining the Enterprise partnership structure, which reduces complexity, enhances transparency for debt and equity investors and reduces the overall cost of financing;

- maintaining EPD's financial flexibility as the unit-for-unit exchange finances approximately 77 percent of the $3.3 billion purchase (including DEP's indebtedness which is already consolidated on EPD's balance sheet) with EPD equity; and

- reducing general and administrative costs by approximately $2 million per year primarily from eliminating public company expenses associated with DEP.

"We fully support the combination of these two successful partnerships," said W. Randall Fowler, president and chief executive officer of DEP's general partner. "We believe DEP unitholders will benefit from the immediate increase in the value of and the distributions on their EPD common units issued as merger consideration as well as EPD's future growth potential."

11

The merger is expected to provide benefits to DEP unitholders by:

- providing DEP unitholders with a value premium of approximately 35 percent through the exchange of 1.01 EPD common units for each DEP common unit based on the closing price for DEP common units on February 22, 2011;

- providing DEP unitholders with a substantial increase in distributions, approximately 32 percent based on the 1.01 exchange ratio and the quarterly distribution rates to be paid by DEP and EPD on May 6, 2011;

- providing DEP unitholders more liquidity by exchanging DEP common units for EPD common units, which have approximately 16 times the average daily trading volume of DEP;

- providing DEP unitholders an investment in a partnership with a stronger credit profile. EPD is rated BBB-, Baa3 and BBB- by Fitch Ratings, Moody's Investor Service and Standard & Poor's, respectively, with an average debt maturity of 10 years compared to DEP which is not rated and has an average debt maturity of less than 3 years;

- providing DEP unitholders with an opportunity to benefit from potential unit price appreciation and increased cash distributions through ownership of EPD units; and

- providing DEP unitholders an ownership in a much larger and more diverse partnership as EPD had over $31 billion of consolidated total assets at December 31, 2010 compared to $5.6 billion of consolidated total assets for DEP.

The completion of the merger is subject to approval by a majority of the outstanding DEP common units. A wholly-owned subsidiary of Enterprise owns approximately 58 percent of DEP outstanding common units and has executed a voting agreement to vote in favor of the merger, which is sufficient to satisfy this condition. The completion of the merger is also subject to approval by the affirmative vote of a majority of the votes cast for or against the merger proposal by DEP's unitholders excluding Enterprise and its affiliates. Completion of the merger, assuming the requisite DEP unitholder vote is obtained, is expected to occur during the third quarter of 2011. No vote by EPD unitholders is required.

The members of the Audit, Conflicts and Governance Committee ("ACG Committee") for the general partner of DEP, who evaluated and negotiated the major terms on behalf of DEP, voted unanimously in favor of the merger. The board of directors for the general partner of EPD also voted unanimously in favor of the merger.

30.     Duncan Energy also filed a Form 8-K with the SEC on April 29, 2011, including a copy of the Merger Agreement upon which Duncan Energy and Enterprise had agreed.

31.     Furthermore, also included in the Proposed Acquisition, GTM, Enterprise, and Duncan Energy entered into an agreement ("Voting Agreement") whereby Enterprise would vote its 58.5% majority, owned by GTM through its affiliates, in Duncan Energy outstanding units in favor of the Proposed Acquisition.

## FALSE MATERIALLY MISLEADING SEC FORM S-4

32.     Fewer than three weeks after the press release announcing the Proposed Acquisition, the Defendants filed a false and misleading S-4 with the SEC on May 18, 2011. The S-4 claims to explain why the DEP directors were recommending that holders of Duncan Energy Common Units vote to approve the Proposed Acquisition.  In violation of §14 (a) and §20(a) of the 1934 Act, the S-4 omits and or materially misrepresents material information about the contemplated transaction.

33.     **Equity Research Analyst Price Targets Analysis by Morgan Stanley.**  Pages 55-56 of the S-4 present Morgan Stanley's Equity Research Analyst Price Targets Analysis.  The S-4 neglects to divulge: (a)the ranges of observed price targets and associated discounted price targets for each Duncan Energy and Enterprise common unit (instead taking into account only those analysts that produced price targets for both Enterprise and Duncan Energy); and (b) the process by which Morgan Stanley concluded that the cost of equity was 10%.  Lacking this crucial and complete information, the analysis description is materially misleading because it prevents unitholders from being able to accurately and independently evaluate whether Morgan

Stanley's Equity Research Analyst Price Targets Analysis is suitable for assessing the Proposed Acquisition's adequacy in their decisions to vote on it.

34.     **Comparable Partnership Trading Analysis by Morgan Stanley.**  Pages 56-57 of the S-4 present Morgan Stanley's Comparable Partnership Trading Analysis.  In this instance, the S-4 neglects to divulge: (a) the actual multiples ranges that Morgan Stanley chose and applied to its analysis of Duncan Energy and Enterprise; and (b) the inputs and methodologies brought into play in determining that the cost of equity discount range was 10.0%.  Lacking this crucial and complete information, the analysis description is materially misleading because it prevents unitholders from being able to understand the process by which the analysis was completed and to evaluate whether Morgan Stanley's Comparable Partnership Trading Analysis is suitable for assessing the Proposed Acquisition in their decisions to vote on it.  In addition, these important details are germane for the purpose of giving unitholders the opportunity to weigh the validity of Morgan Stanley's fairness opinion.

35.     **Discounted Equity Value Analysis by Morgan Stanley.**  Pages 57-58 of the S-4 present Morgan Stanley's Equity Value Analysis.  In this instance, the S-4 neglects to divulge: (a) the actual long-term rates of growth that were applied in determining Duncan Energy and Enterprise's 2014 and 2015 estimated distributions; (b) the inputs and methodologies brought into play in determining that the cost of equity discount rate range was 9.0%-11.0%; (c) resultant value of Duncan Energy and Enterprise for 2012 and 2014 indicated by using estimates from the management, the IBES Consensus, distribution growth, and adjusted distribution growth; (d) the resultant implied ratios of exchange for 2012 and 2014; and finally, (e) the individually observed coverage ratios of the companies used to calculate that 1.23x was the "average" distribution coverage and the names of the companies used. Lacking this crucial and complete information,

the analysis description is materially misleading because it prevents unitholders from being able to understand the process by which the analysis was completed and to evaluate whether Morgan Stanley's Discounted Equity Value Analysis is suitable for assessing the Proposed Acquisition in their decisions to vote on it.

36.     **Discounted Cash Flow Analysis by Morgan Stanley.**  Pages 58-59 of the S-4 present Morgan Stanley's Discounted Cash Flow Analysis. The S-4 neglects to divulge: (a) the inputs and methodologies that were used in determining that the range for the cost of equity discount rate was 9.0%-11.0%; and (b) the explanations for why Duncan Energy's selected growth rates were 1.0%-5.0%, while Enterprise's were 2.0%-5.0%.  This information is crucial for allowing unitholders to understand the process by which the analysis was completed because the discount rates selected and other critical data inputs are of great consequence when performing the Discounted Cash Flow Analysis.  Withholding these critical details precludes unitholders from accurately and independently evaluating the proper performance of the analysis, and as a result, what significance, if any, to give to Morgan Stanley's Discounted Cash Flow Analysis, as well as to its fairness opinion regarding the Proposed Acquisition in their decisions to vote on it.

37.     **Precedent Transactions Analysis by Morgan Stanley.**  Pages 59-61 of the S-4 present Morgan Stanley's Precedent Transactions Analysis.  The S-4 neglects to divulge the true premia and the multiple reference ranges that Morgan Stanley chose and applied to Duncan Energy. Lacking this crucial and complete information, the analysis description is materially misleading because it prevents unitholders from being able to understand the process by which the analysis was completed and to evaluate independently whether Morgan Stanley's Precedent

Transactions Analysis is suitable for assessing the Proposed Acquisition in their decisions to vote on it.

38.    **Pro Forma Accretion/Dilution Analysis by Morgan Stanley.**  Page 61 of the S-4 presents Morgan Stanley's Pro Forma Accretion/Dilution Analysis.   The S-4 neglects to divulge the scale of the accretion/dilution (in dollars and percentages) observed each year for Duncan Energy and for Enterprise. Lacking this crucial and complete information, the analysis description is materially misleading because it prevents unitholders from being able to understand the process by which the analysis was completed and to evaluate independently whether Morgan Stanley's Pro Forma Accretion/Dilution Analysis is suitable for assessing the Proposed Acquisition in their decisions to vote on it.

39.    **Duncan Energy and Enterprise's Financial Projection Estimates Used by Morgan Stanley.**   The S-4 neglects to disclose the complete financial projections given to Morgan Stanley by Duncan Energy and Enterprise managements.   These details include: (a) 2014-2015's distributable cash flow; (b) 2011-2105's distributions; (c) FY + 1 EBITDA; and (d) 2011-2015's pro forma combined distributable cash flow and distributions.  These forecasts are the best estimates of the companies' future financial prospects provided to Morgan Stanley by the managements of Duncan Energy and Enterprise.   Lacking these details, unitholders are unable to consider the Proposed Acquisition side by side with the currently independent Company's financial forecasts; therefore, unitholders are denied the opportunity to decide which alternative is in their own best interests.  Furthermore, lacking this crucial information about the projections, upon which the analysis depends, unitholders are prevented from independently evaluating both the S-4's presentation of the analysis by Morgan Stanley and whether Morgan Stanley's assessment of the Proposed Acquisition is adequate.   As a result, unitholders are

prevented from independently evaluating the applicable significance of the fairness opinion rendered by Morgan Stanley.

40.     The aforementioned information that was omitted from the S-4 should have been disclosed, and the Defendants knew that they had a duty to disclose.  Thus, their failures to disclose or to ensure that the information was disclosed constituted, at the very least, negligence on their parts.  The lack of this crucial and complete material information renders unitholders unable to arrive at an informed decision about whether to cast an affirmative vote for the Proposed Acquisition.  As a result of Defendants' failures to disclose, unitholders face a threat of irreparable harm that warrants injunctive relief.

### DEFENDANTS' EXPRESS AND IMPLIED BREACHES OF THE LPA

41.     Under the LPA, purchase of any assets from Duncan Energy by DEP or an affiliate, such as Enterprise, is governed by Section 7.6(e), which provides:

> ***Neither the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, a Group Member,***[2] ***directly or indirectly, except pursuant to transactions that are fair and reasonable to the Group Member***; *provided, however*, that the requirements of this Section 7.6(e) shall be deemed to be satisfied as to (i) the transactions effected pursuant to Sections 5.2 and 5.3 and any other transactions described in or contemplated by the Registration Statement, (ii) any transaction approved by Special Approval, (iii) any transaction, the terms of which are objectively demonstrable to be no less favorable to the [Duncan Energy] than those generally being provided to or available from unrelated third parties, or (iv) any transaction that, taking into account the totality of the relationship between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership), is equitable to the [Duncan Energy] .... [Emphasis added.]

42.     As identified above, it is apparent that the Proposed Acquisition, under the explicit guidelines of the LPA, does not meet the requirement of being "fair," nor of being "reasonable" to neither Duncan Energy, nor its unitholders. Therefore, entering into this

---

[2] Under the provisions of the LPA, Duncan Energy is considered a "Group Member."

Proposed Acquisition would be in direct contrast to the express provisions and guidelines set by the LPA.

43.     Defendants may attempt to rely on Section 7.9(a), the "Special Approval" condition, of the LPA to shield the Proposed Acquisition from judicial intervention. Section 7.9(a) provides, in relevant part:

> Unless otherwise expressly provided in this Agreement or any Group Member Agreement, whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, any of its Subsidiaries or any Partner, on the other hand, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, any Group Member Agreement or of any agreement contemplated herein or therein, or of any duty expressed or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is or, by operation of this Agreement is deemed to be, fair and reasonable to the Partnership; *provided* that, **any conflict of interest and any resolution of such conflict of interest shall be deemed fair and reasonable to the Partnership if such conflict of interest or resolution is (i) approved by Special Approval**, or (ii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties .... **In the absence of bad faith by the Audit and Conflicts Committee or the General Partner**, the resolution, action or terms so made, taken or provided (including granting Special Approval) by the Audit and Conflicts Committee or the General Partner with respect to such matter shall be conclusive and binding on all Persons (including all Partners) …. [Emphasis added.]

44.     According to the LPA, "Special Approval" is approval by a majority of Duncan's ACG Committee members.  However, the LPA does not delineate the terms governing a determination of Special Approval by the Duncan ACG Committee.  However, the DRULPA requires that limited partnerships agreements, at the very least, abide by the implied covenant of good faith and fair dealing.  Therefore, when granting Special Approval, the Duncan ACG Committee is subject to the implied covenant of good faith and fair dealing.  See 6 Del. C. * 17-1101 (d).

45.     If the Individual Defendants in this case, including the Duncan ACG Committee and the complete Board had acted in good faith, the Proposed Acquisition would not have been approved.  Duncan Energy, DEP, and the Individual Defendants breached the implied covenant of good faith and fair dealing in the LPA under the DRULPA when they approved the Proposed Acquisition in spite of: (a) the offer's inadequate exchange ratio; and (b) the multiple unresolved conflicts of interest existing among the participating entities.

46.     In addition to the foregoing, the Duncan ACG Committee, DEP, and the Individual Defendants are bound by certain explicit obligations under the LPA.  Section 7.9 (g), the "Comparable Transactions Clause", provides that:

> [w]henever a particular transaction, arrangement or resolution of a conflict of interest is required under this Agreement to be "fair and reasonable" to any Person, the fair and reasonable nature of such transaction, arrangement or resolution may be considered by the General Partner or its Board of Directors (or any committee thereof, including the Audit and Conflicts Committee) *in the context of all similar or related transactions.* [Emphasis added.]

47.     Likewise, under the LPA, the Duncan ACG Committee must determine if the terms of the Proposed Acquisition are *"no less favorable to [Duncan Energy] than those generally...available from unrelated third parties"* in order to comply with the fair and reasonable requirement in Section 7.6(e).  LPA, Section 7.6 (e) (iii) (emphasis added) (the "Third Parties Clause").

48.     In this case, Duncan ACG Committee failed to ensure that the Proposed Acquisition was "fair and reasonable" to the Company or its common unitholders by neglecting to even attempt to satisfy either the Comparable Transactions Clause or the Third Parties Clause. Actually, as explained herein *infra*, the Merger Agreement, particularly its preclusive deal protection devices, is intentionally designed: (a) to avert a market check, preventing the collection of data regarding possibly comparable transactions, and (b) to eventually foil attempts

by third parties to make unsolicited competitive proposals.  That is, by failing even to negotiate for the best available price for unitholders, Individual Defendants and DEP not only undervalued the Company; under the LPA, they breached their explicit duties.  The result is that the Proposed Acquisition is unfair and unreasonable to the Company.  A prudent fiduciary acting in good faith could not have agreed to the Merger Agreement's terms or the Proposed Acquisition unless they knowingly and deliberately were acting in the best interests of Enterprise and its affiliates rather than those of the common unitholders of Duncan Energy.

49.     Finally, the unresolved conflicted relationships between and among the Individual Defendants and the entity defendants combined with the control exercised over Duncan Energy, DEP, and the Duncan ACG Committee by Enterprise, made the process of Special Approval under LPA Section 7.9(a) null and void.  As a result, because the Special Approval process did not satisfy the requirements of the LPA, Defendants breached their explicit contractual obligations under the LPA and therefore bear liability.

50.     The April 29, 2011 release implies that the Proposed Consideration is liberal. However, the Proposed Consideration fails to represent the true value of Duncan Energy's substantial assets and prospects for future financial growth.  Consummating the Proposed Acquisition would bestow upon Enterprise Duncan Energy's outstanding limited partnership units for the extremely unfair exchange ratio of 1.010 Enterprise units for 1.0 Duncan Energy unit.  This exchange ratio fails to take into consideration Duncan Energy's bright prospects for the future, especially given its recent financial achievements of Duncan Energy, including the fact that the value of Duncan Energy Units more than doubled in the past year.

51.     For instance, on January 14, 2011, the DEP Board publicized that it was increasing the Company's cash distributions by 2.2% to $0.455 per public unit, marking the

ninth consecutive quarter of increased cash distributions.  Then, on February 17, 2011, Duncan Energy reported a record fourth quarter $25 million net income and a record quarterly gross operating margin of $81.9 million, outpacing the prior quarter by 10%.  Additionally, in January 2011, the Company started building its 270-mile Haynesville Extension of its Acadian Gas pipeline system (the Haynesville Extension").  Defendant Fowler reported that the Haynesville Extension should be completed, under budget, by September.  Starting in September 2011, Duncan Energy can expect a significant rise in cash flow with the opening of the Haynesville Extension.  The nearly 32% rise in cash distributions to unitholders "[b]ased on the [quarterly] cash distributions to be paid by [Enterprise and the Company] on May 6, 2011," advertised in the April 29, 2011 press release as justification for the adequacy of the Proposed Consideration fails to take into account this upcoming and long-term increase in cash flow. Because the merger's consummation is not scheduled to occur until 2011's third quarter, the temporary increase of 32% in distributions may pale in comparison to the distributions that the Company's unitholders would receive after the opening of the Haynesville Extension if Duncan Energy remains independent, further demonstrating the Proposed Consideration's insufficiency.

52.     It is clear that Duncan Energy is on course to succeed financially in the immediate, foreseeable, and long-term future.  The upcoming opening of the Haynesville Extension makes Duncan Energy's prospects especially bright.  With that in mind, the Merger Agreement's Proposed Consideration clearly demonstrates the objective of Enterprise, which is controlling the transactional process, to obtain Duncan Energy with its lucrative Haynesville Extension at an exchange ratio that fails to reflect the value of either the Company or the Haynesville Extension asset.  This fact raises serious doubts about both the desire, and the ability

of the Individual Defendants to facilitate for unitholders a transaction that accurately reflects the true value of the Company with its significant assets.

53.     Even the market has acknowledged the Company's intrinsic value.  Raymond James Financial, Inc.'s Darren Horowitz gives the Company an "outperform" rating, while Citigroup Inc.'s John K. Tysseland and Ladenburg Thalmann & Co.'s Eduardo Seda have repeatedly recommended buying and holding Duncan Energy Units.  In light of Duncan Energy's expected growth, the intrinsic value of the Company is substantially greater than the amount of the Proposed Consideration (including the mere 5% increase from the Initial Offer) to be paid to Plaintiffs and the Class members.  Thus, the Proposed Acquisition is unfair and grossly inadequate.

54.     The Individual Defendants and DEP breached the LPA's implied covenant of good faith and fair dealing because they have agreed to Proposed Acquisition and the unfair, inadequate, and unreasonable Proposed Consideration included therein.   Unless this Court enjoins them from so doing, Defendants may proceed with the unfair and under priced Proposed Acquisition, irreparably harming Duncan Energy's common unitholders.

55.     As explained below, it is indisputable that Enterprise controls Duncan Energy. Through EPO, its wholly owned subsidiary, Enterprise owns 100% of DEP. Through GTM, its affiliate, Enterprise owns nearly 58.5% of the outstanding public units of the Company. Moreover, Enterprise combines Duncan Energy's periodic financial statements with those of itself.  Finally, Enterprise hosts calls for joint earnings with Duncan Energy. The reality of Enterprise's control of the Company is also demonstrated in three important ways.

56.     First, affiliates Duncan Energy, DEP, EPO, Enterprise, Enterprise GP, EPCO, and Dan Duncan LLC are under the collective common control of the Trustees of DD LLC[3] and EPCO.[4]

57.     Second, Duncan Energy's Form 10-K filed on March 1, 2011 ("2011 10-K") with the SEC explains:

> We will have inherent conflicts of interest with affiliates of our general partner, including Enterprise.  These conflicts may cause the ACG Committees of these entities not to approve, or unitholders of these entities to dispute, any transactions that may be proposed or consummated between or among us and these affiliates. This may inhibit or prevent us from consummating transactions, including acquisitions, with them.

58.     Thirdly, the 2011 10-K states:

> We have no officers or employees and rely solely on officers of our general partner and employees of EPCO. Certain of our officers are also officers of EPCO and other affiliates of EPCO. These relationships may create conflicts of interest regarding corporate opportunities and other matters, and the resolution of any such conflicts may not always be in our or our unitholders' best interests. In addition, these overlapping officers allocate their time among us, EPCO and other affiliates of EPCO. These officers face potential conflicts regarding the allocation of their time, which may adversely affect our business, results of operations and financial position.

> We have entered into the ASA, which governs business opportunities among entities controlled by EPCO, which includes us and our general partner and Enterprise and its general partner.

59.     The abovementioned illustrates the great extent of Enterprise and its affiliates' control of the Company.   As a result, regarding the Proposed Acquisition, Defendants are

---

[3] The DD LLC Trustees are (i) Randa Duncan Williams (Dan L. Duncan's oldest daughter) who is also a director of Enterprise GP ("Williams"); (ii) Dr. Ralph S. Cunningham, a director and Chairman of Enterprise GP and a manager of Dan Duncan LLC ("Cunningham"); and (iii) Richard H. Bachmann ("Bachmann"), a director of Enterprise GP and a manager of Dan Duncan LLC.

[4] The EPCO Trustees are (i) Williams, Chairman of EPCO; (ii) Cunningham, Vice Chairman of EPCO; and (iii) Bachmann, President and CEO of EPCO.  In addition, Williams, Cunningham, and Bachmann are currently directors of EPCO.  Thus, the current EPCO Trustees are the same as the Trustees of DD LLC who control Dan Duncan LLC.

obviously straddling both sides.  Moreover, through its affiliates, Enterprise holds a majority of the Company's units; therefore, it is practically a foregone conclusion that the Proposed Acquisition will be approved.

60.     The Individual Defendants' conflicts of interest render them at odds with the best interests of the Company's common unitholders.  As mentioned above, the Company is managed by the five-member DEP Board, most of who are or have been employed by Enterprise and/or its affiliate companies.

61.     In particular, individual defendant Fowler has had a consistent and long-term relationship with Enterprise and its affiliates.  Joining Enterprise as its Investor Relations Director in January of 1999, he has acted since November 2010 as EVP and CFO of Enterprise GP, and as EPGP's EVP and CFO from August 2007 to November 2010, and as Enterprise GP's SVP and Treasurer from February 2005 to August 2007.  From February 2006 to May 2010, he acted as director of Enterprise GP and EPE Holdings.  In addition, he acted as SVP and CFO of EPE Holdings from August 2005 to August 2007.  In May 2010 Fowler was elected as EPCO's Vice Chairman and CFO; he has acted as EPCO's director since December 2007.  Lastly, Fowler acted as EPCO's President and CEO from December 2007 to May 2010 and as its CFO from April 2005 to December 2007.

62.     Likewise, since October 2009, individual defendant Bulawa acted as Enterprise GP's SVP and Treasurer, having from July 2007 to October 2009 acted as VP and Treasurer.

63.     From June 2000 until February 2006, Individual defendant Snell acted as Enterprise GP's director and also acted as Texas Eastern Products Pipeline Co, LLC's director from January 2006 until October 2009 when it merged with one of Enterprise's subsidiary.

64.     The aforementioned individual defendants serve as a few examples of the unresolved conflicts of interests existing in this case.  Their dual loyalties to the Company and to Enterprise render it impossible for them to have weighed the fairness of the Proposed Acquisition and its Proposed Consideration in such a way that pursued the best interests of and best available price for the Company and its public unit holders.  These conflicts also make them unable to weigh the fairness of any competitive offers or third-party acquisition proposals that might arise.

65.     The LPA outlines the procedures regarding any merger involving the Company.  According to the LPA, the Proposed Acquisition must be approved by DEP.  In particular, Section 14.2 states that a "[m]erger, consolidation, or conversion of [Duncan Energy] pursuant to this Article XIV requires the prior consent of the General Partner and Special Approval…"

66.     As a result, because DEP has to approve the Proposed Acquisition and because through EPO, Enterprise controls 100% of DEP and most of the directors of DEP are former or current Enterprise officers and/or directors, a vote approving the Proposed Acquisition is a foregone conclusion with no regard to the terms' fairness.  In fact, the Merger Agreement itself reveals that the Proposed Acquisition has *already* been approved by both the full Board and the Duncan ACG Committee.

67.     Moreover, according to the LPA, once DEP approves the Proposed Acquisition, the limited partners must vote upon any proposed business combination.  In particular, Section 14. 3(a) states:

> Except as provided in Section 14.3(d) and Section 14.3(e), the General Partner, upon its approval of the Merger Agreement or the Plan of Conversion, shall direct that the Merger Agreement or the Plan of Conversion be submitted to a vote of Limited Partners, whether at a special meeting or by written consent, in either case in accordance with the requirements of Article XIII. A copy or a summary of the Merger Agreement or the Plan

of Conversion, as the case may be, shall be included in or enclosed with the notice of a special meeting or the written consent.

68.     Furthermore, under the LPA, an affirmative vote of the majority of unitholders must approve a business combination.   In particular, Section 14.3(b) states: "the Merger Agreement or Plan of Conversion shall be approved upon receiving the affirmative vote or consent of the holders of a majority of Outstanding Units."

69.     As indicated above, through its affiliates Enterprise owns 58.5% of the Company. As a result, in any transaction, like the Proposed Acquisition, initiated by Enterprise or one of its affiliates, a majority vote in favor of the transaction is a foregone conclusion.   Actually, the Merger Agreement itself reveals that Enterprise has already promised, and is obligated by the contractual terms of the Voting Agreement, to vote affirmatively its 58.5% interest in the Company, approving the Proposed Acquisition.

70.     By straddling both sides of the transaction, the Individual Defendants and the Company have breached the LPA and have defied the implied contractual covenant of good faith and fair dealing which is owed to the public unitholders, allowing Enterprise to ensure that it acquires Duncan Energy at an exchange ratio that is inadequate to compensate the Company's public unitholders, just as it serves Enterprise's objective of acquiring precious assets at an unfair and unreasonable price by: (a) offering a Proposed Consideration that does not adequately reflect the actual intrinsic value of Duncan Energy; and (b) including in the Merger Agreement terms that forbid the solicitation of competitive proposals and discourage unsolicited proposals by third parties as explained below.

71.     The Proposed Acquisition is an effort to deny Plaintiffs and other Class members their right to get a proportionate and fair portion of the Company's precious assets, future financial gains in profits, earnings, distributions, and dividends.   Clearly, the Proposed

Acquisition is harmful, unfair, and wrongful to Duncan Energy's common unitholders.  Owing to these actions, Plaintiffs and other Class members will suffer damage in that they will be denied their equity ownership's fair intrinsic value, and they will be prevented from obtaining their fair share of Duncan Energy's value.

72.     To the irreparable harm of the Plaintiffs and the Class, the Individual Defendants and DEP will continue violating the implied contractual covenant of good faith and fair dealing and will continue breaching the LPA, all aided and abetted by Enterprise and its affiliates, unless the Court enjoins the Proposed Acquisition.

## THE MERGER AGREEMENT'S PRECLUSIVE DEAL PROTECTIONS

73.     The Company is unreasonably and unfairly limited from seeking competitive offers by the Merger Agreement - - eliminating a market check on the terms of the Proposed Acquisition.  In their failure to seek the best available offer for Duncan Energy, the Individual Defendants clearly breached the implied covenant of good faith and fair dealing.  Furthermore, this failure caused Individual Defendants to disregard their express contractual obligations according to the "fair and reasonable" standard for conflicted transactions under the LPA's Comparable Transactions and Third Parties Clauses, as defined herein.

74.     The Merger Agreement, contrary to the best interests of Duncan unitholders, does not allow the Company to "shop around" for the best offer.  According to Section 6.6(a) of the Merger Agreement, the Company is bound by a no-solicitation clause prohibiting Duncan from soliciting offers that might be superior to the Proposed Acquisition.  Merger Agreement Section 6.6(a) reads:

> Neither Duncan GP nor Duncan shall, and they shall use their commercially reasonable best efforts to cause their Representatives not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or facilitate any inquiries or the making or submission of any proposal that constitutes, or may reasonably be expected to

lead to, an Acquisition Proposal, [5] or (ii) participate in any discussion or negotiations regarding, or furnish to any person any non-public information with respect to, any Acquisition Proposal. Notwithstanding the foregoing, nothing contained in this Agreement shall prohibit Duncan or any of its Representatives from furnishing any information or data pertaining to Duncan, or entering into or participating in discussions or negotiations with, any person that makes an unsolicited written Acquisition Proposal that did not result from a knowing and intentional breach of this Section 6.6 (a "Receiving Party"), if (i) the Duncan Audit Committee after consultation with its outside legal counsel and financial advisors, determines in good faith (A) that such Acquisition Proposal constitutes or is likely to result in a Superior Proposal, and (B) that failure to take such action would be inconsistent with its duties under the Duncan Existing Partnership Agreement and applicable Law and (ii) prior to furnishing any such non-public information to such Receiving Party (including any information pertaining to Duncan Subsidiaries in which Partners has an equity interest or transactions to which Partners is a party), Duncan receives from such Receiving Party an executed Confidentiality Agreement.

75.     Barred from shopping around by the Merger Agreement's no-solicitation device, the Company is prevented from getting the best available offer for its unitholders. Considering this no-solicitation clause in tandem with the Voting Agreement (mentioned above) ensuring the passage of the Proposed Acquisition with an affirmative vote of 58.5%, it is clear that, in approving the Proposed Acquisition, the Individual Defendants, Duncan Energy, and DEP, neglected even to attempt to obtain for their unitholders the maximum consideration available. Instead, by avoiding any hindrances that might be caused by third party bidders, Individual Defendants, Duncan Energy, and DEP focused on completing a deal with Enterprise, their preferred acquirer.

---

[5] The Merger Agreement defines "Acquisition Proposal" as "any proposal or offer from or by any person other than Enterprise, EPD GP or Merger Co relating to: (a) any direct or indirect acquisition of (i) more than 20% of the assets of Duncan Energy and its subsidiaries or the outstanding equity securities of Duncan Energy, or (ii) a business or businesses that constitute more than 20% of the cash flow, net revenues, net income or assets of Duncan Energy and its subsidiaries, taken as a whole; or (b) any tender offer or exchange offer, as defined under the 1934 Act, that, if consummated, would result in any person beneficially owning more than 20% of the outstanding equity securities of Duncan Energy; or (c) any merger, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving Duncan Energy, other than the merger" (hereinafter "Acquisition Proposal").

76.     The Merger Agreement's Section 6.6(c) provides that if Duncan Energy receives an unsolicited Acquisition Proposal or becomes aware of any issue that may cause Duncan ACG Committee to change its affirmative recommendation of the Proposed Acquisition, it must give Enterprise oral and written notice within twenty-four hours of the Acquisition Proposal, it must supply the identity of the potential acquirer, and the terms and conditions of the proposal offer. Thus, any unsolicited competitive bidder would have to absorb the expense of being subject to a very limited timeframe under which to perform due diligence and compose a proposal.

77.     The Merger Agreement's Section 6.6(b) restricts the Board from terminating the Proposed Acquisition and accepting a Superior Proposal[6] unless, among other things, Duncan's ACG Committee: "(i) determines in good faith that the failure to do so would reasonably be expected to be inconsistent with its duties under the LPA; (ii) provides Enterprise with three-days written notice of the Superior Proposal, including the material terms and conditions, the identity of the person making the Superior Proposal, and copies of documents provided to the offeror to date, and (iii) provides Enterprise notice and an additional three business days for each subsequent amendment to the terms of the Superior proposal," presumably to permit further negotiating and counteroffers to take place.

78.     Even a determined bidder making an unsolicited Superior Proposal and qualifying for Duncan Energy's active consideration as an offeror would be subjected to negotiations with management officers with conflicts of interest.  It would be impossible for such a conflicted

---

[6] The Merger Agreement defines a "Superior Proposal" as follows: "any bona fide Acquisition Proposal (except that references to 20% within the definition of 'Acquisition Proposal' shall be replaced by '50%')made by a third party on terms that the Duncan Audit Committee determines, in its good faith judgment and after consulting with its or Duncan's financial advisors and outside legal counsel, and taking into account the financial, legal, regulatory and other aspects of the Acquisition Proposal (including any conditions to and the expected timing of consummation and any risks of non-consummation), to be more favorable to the holders of Duncan Common Units, from a financial point of view, than the Merger…"

management team that is already intending to complete the transaction with Enterprise to act in Duncan Energy's unitholders' best interests.

79. Because the Merger Agreement crafted by Defendants and approved by Individual Defendants intentionally prevents the Company from seeking competitive offers and discourages third party bids by unsolicited offerors, it is doubtful that Duncan ACG Committee or the Board performed a market check regarding the Proposed Acquisition or the true value of the Company as a potential acquisition. Inasmuch as the Individual Defendants, aided and abetted by Enterprise and its affiliates, failed to maximize consideration for unitholders, they have breached their express and implied contractual obligations under the LPA.

80. As a result, it is clear that the Proposed Acquisition is intrinsically unfair to Duncan Energy's Common Unitholders. By agreeing to the Merger Agreement's unfair and inadequate terms, by failing to maximize the value of Duncan Energy for its holders of Common Units, by neglecting to address and resolve obvious conflicts of interest making it impossible for Individual Defendants to act in Duncan Energy unitholders' best interests, Defendants breached, or aided and abetted in the breaching of, express and implied contractual obligations under the LPA's provisions. If the Court does not enjoin the Proposed Acquisition, or rescind the Proposed Acquisition if it is consummated, Plaintiffs and the Class will suffer irreparable harm.

## CLASS ACTION ALLEGATIONS

81. Plaintiffs' "direct" claims are brought as class claims, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other unitholders (the "Class"). Excluded from the Class are Defendants, affiliates of the Defendants, and any person or entity related or affiliated with the Defendants, including the Individual Defendants.

82.     The direct claims are properly maintainable as class claims for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of April 29, 2011 Duncan Energy had outstanding 57.77 million common units, held by individuals and institutions too numerous to bring separate actions. Moreover, it is reasonable to assume that holders of Duncan Energy common stock are geographically dispersed throughout the United States and the world;

(b)     Plaintiffs will fairly and adequately protect the interests of the members of the Class, inasmuch as they are members of the Class and their claims are typical of the claims of all Class members. Plaintiffs have retained competent counsel experienced in securities class action litigation. Plaintiffs' interests are to obtain appropriate relief for themselves and for the Class for the harms arising out of the misconduct set forth herein;

(c)     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include:

(i)     Whether Defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder;

(ii)     Whether Defendants breached and/or aided in the breach of the express and implied contractual duties by other Defendants, under the terms of the LPA; and

(iii)     Whether Plaintiffs, and the Class will suffer irreparable harm if Defendants finalize and implement the terms of the Proposed Acquisition, as outlined above.

83.     A class action is superior to other available methods for the fair and efficient adjudication of Plaintiffs' direct claims. It would be impracticable and undesirable for each member of the Class who has suffered harm to bring a separate action for these claims. In addition, the bringing of separate actions would put a substantial and unnecessary burden on this and other Courts throughout the United States, while a single class action can determine the rights of all class members with judicial economy.

84.     Furthermore, as the damages suffered and to be suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs committed against them. No unusual difficulties are likely to be encountered in the management of the class claims.

85.     The Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of in the direct claims, thereby making appropriate the relief sought in those claims with respect to the Class as a whole.

86.     The prosecution of separate actions would create the risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the Defendants, and/or adjudications which as a practical matter might be dispositive of the interest of other members of the Class.

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act
and SEC Rule 14a-9 Promulgated Thereunder**

87.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

88.     During the relevant period, Defendants, including Duncan energy, enterprise, DEP, and the Individual Defendants, provided false and misleading information in the S-4 filed

with the SEC on May 18, 2011. Defendants disseminated this false and misleading S-4, which omitted to state material facts and information that were necessary to make the statement contained therein not false and misleading.

89.     The S-4, which was prepared, reviewed, provided, and disseminated by the Defendants, omitted and/or misrepresented material facts. This included misstatements and omissions concerning a complete informational sheet on the Company's true financial forecasts, assumptions, and input data used for the fairness opinion as determined by Morgan Stanley.

90.     By disseminating this false and misleading S-4, which omitted to state material facts and information that were necessary to make the statement contained therein not false and misleading, Defendants violated §14(a) of the 1934 Exchange Act and SEC Rule 14a-9 promulgated thereunder. Defendants, in the exercise of their positions, should have known the truth of these false and misleading statements contained within the S-4 and their duty to disclose this information within the S-4.

91.     Defendants were at least negligent in filing the S-4 with these materially false and misleading statements.

92.     The misrepresented or omitted facts in the S-4 are material because under all circumstances, there is a substantial likelihood that a reasonable unitholder would consider the false and misleading statements or omitted facts important in deciding how to vote on the Proposed Acquisition or a material part of the mix of information available to unitholder in deciding how to exercise their voting rights. Thus, unitholders were denied the opportunity to make an informed decision in voting on the Proposed Acquisition.

93.     As set forth above, Defendants are in violation of §14(a) of the 1934 Act and SEC rule 14a-9 promulgated thereunder.

94.     As a result of the false and misleading statements within the S-4, Plaintiffs are threatened with irreparable harm, rendering money damages inadequate. Therefore, in this case, Defendants must be enjoined to ensure this misconduct is corrected.

**COUNT II**

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

95.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

96.     The "Individual Defendants acted as controlling persons of Duncan energy within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements contained in the S-4 and filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

97.     In particular, each of these Defendants has direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Furthermore, as described herein and in the S-4, each of the

Individual Defendants reviewed, negotiated, and unanimously approved the Proposed Acquisition. Thus, the Individual Defendants were directly involved in the making of this document.

98.     As alleged herein, the Individual Defendants are in violation of Section 20(a0 of the 1934 Exchange Act.

99.     As set forth above, the Individual Defendants, through the actions and omissions, were able to exercise control over and did control a person or persons who each violated Section 14 (a) and SEC Rule 14a-9, alleged herein. Pursuant to their positions as controlling persons, each Individual Defendant is liable under Section 20(a) of the 1934 Exchange Act. Directly, and as a proximate result of the Individual Defendants' actions, conduct and omissions, Duncan Energy, and its public unitholders will be irreparably harmed.

## COUNT III

### Against Defendants for Breach of the Implied and Express Contractual Duties

100.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

101.     Under the provisions of the LPA, Plaintiffs and the Class are owed implied contractual duties by the Individual Defendants, as directors of Duncan Energy's general partner and its controller, and DEP, as Duncan Energy's general partner.

102.     As reasoned herein, the Individual Defendants and DEP breached, and are in the process of breaching, their implied and express duties under the provision of the LPA, specifically their implied duties of good faith and fair dealing, by entering into the Merger Agreement and in pursuing a merger that is not in their best interest, that is nether fair, nor reasonable, and being entered into in bad faith on their part.

103.    In order to comply with its implied and express contractual duties, Defendants would need to:

(a)    Undertake an accurate valuation of the Company's candidacy for merger or acquisition, making sure to include the accurate valuation in the Proposed Acquisition and that the Proposed Consideration reflected this accurate valuation;

(b)    Protecting Duncan Energy's unitholders by acting independently;

(c)    Ensuring and confirming that no conflicts of interest exist among the interests of the Individual Defendants and any obligations they have to Duncan Energy's unitholders. In the case that such conflicts do arise, that they are identified and resolved accordingly to protect the interests of Duncan Energy's unitholders; and

(d)    Accurately evaluating any Proposed Acquisition, and conducting market checks and meaningful actions with third parties to maximize the valuation of Duncan Energy in any merger, acquisition, sale, or any other transaction.

104.    In agreeing and pursuing the Proposed Acquisition, the Individual Defendants and DEP are accepting an unreasonably low price that does not reflect an accurate, intrinsic, and true valuation for Duncan Energy. It is evident that in doing so the Individual Defendants are not acting independently and in the best interests of the Company and its unitholders. The Individual Defendants have allowed Enterprise's control to overtake what could be a reasonable, good faith, and fair assessment of the Proposed Acquisition, and have allowed conflicts of interest to influence this transaction. In addition, they have failed to conduct adequate market checks and assess the Company's true value to maximize its candidacy for merger and return on investment for its unitholders.

105.    Furthermore, Individual Defendants have a duty and obligation to only provide accurate and complete information in their disclosures. Regardless, Individual Defendants irresponsibly disseminated materially misleading and false information to the Company's common unitholders.

106.    Defendants failed to disclose in the S-4 material financial facts and information that were necessary to make the statement contained therein not false and misleading.

107.    The omissions and misleading statements concerning this material financial facts and information, provided to the Board and its financial advisors, affirms the insufficiency of the S-4 disclosures to the unitholders. Without a full disclosure of the material financial facts and information, Plaintiffs and the Class are unable to cast an informed decision, and are therefore damaged, not knowing whether to vote their units in favor or against the Proposed Acquisition.

108.    If the Proposed Acquisition, in its current state, is finalized and approved, Plaintiffs and the Class will suffer irreparable injury from the Defendants' breaches of their implied and express contractual duties.

109.    Unless and until the Court enjoins Defendants of their conduct, they will continue breaching their implied and express contractual duties owed to Plaintiffs and the Class.

110.    Plaintiffs and the Class have no adequate remedy at law.

## <u>COUNT IV</u>

**Against Defendants for Aiding and Abetting other Defendants'
Breach of the Implied and Express Contractual Duties**

111.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

112. By reason of the foregoing, the implied and express contractual duties owed Duncan Energy's unitholders was breached by DEP and the Individual Defendants in pursuit of the Proposed Acquisition.

113. The knowing participation and assistance of each Defendant in the pursuit of the Proposed Acquisition aided and abetted the Individual Defendants, DEP, and Duncan Energy in the breach of these implied and express duties. Otherwise, without their participation in this pursuit, these breaches would not have occurred. The actions of each Defendant, was taken with the direct knowledge or reckless disregard thereof, to the fact that the Individual Defendants and DEP were breaching and aiding in the breach of their contractual duties.

114. For the reasons stated above, Defendants' actions and conduct must be enjoined by this Court, or else the breaches of implied and express contractual duties to Plaintiffs and the Class will continue to be aided by the Individual Defendants and DEP.

115. In the absence of injunctive relief, Plaintiffs and the Class have no adequate remedy at law, and will therefore continue to suffer irreparable harm as a direct result of Defendants' actions and conduct in assisting the Individual Defendants and DEP in breaching their implied and express contractual duties.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

116. Determining that this action is a proper class action;

117. Designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead counsel;

118.    Directing Defendants to take all necessary action to procure a business deal in the best interests of Duncan Energy and its unitholders;

119.    Against Defendants and in favor of the Class, enjoining Defendants, as well as their counsel, agents, and employees from finalizing and implementing the terms of the Proposed Acquisition, until at which time Defendants fulfill their duties under the 1934 Act by providing Duncan Energy unitholders with a complete informational sheet on the Company's true financial forecasts, assumptions, and input data used for the fairness opinion drafted by Morgan Stanley;

120.    Against Defendants and in favor of the Class, finding Defendants breached and/or aided in the breach of the express and implied contractual duties by other Defendants, under the terms of the LPA;

121.    Rescinding the Proposed Acquisition and its terms, in the extent that it has already been implemented;

122.    Awarding Plaintiffs costs and disbursements incurred in this action, including reasonable attorneys' fees and experts' fees, costs, and expenses; and

123.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 3, 2011          **THE SADIN LAW FIRM**

By:    */s/ Art Sadin*
Art Sadin (Texas Bar No. 17508450)
121 Magnolia Street, #102
Friendswood, TX 77546
Telephone: (281) 648-7711
Fax: (281) 648-7799
asadin@sadinlawfirm.com

**KAHN SWICK & FOTI, LLC**
Albert M. Myers (*pro hac vice* application to be filed)
albert.myers@ksfcounsel.com
Melinda A. Nicholson (*pro hac vice* application to be filed)
melinda.nicholson@ksfcounsel.com
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Attorneys for Plaintiffs John Rinker and Arthur H. Speier*

## CERTIFICATION PURSUANT TO SECURITIES LAWS

   John Rinker            (name) ("Plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.  Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and retains the firm of Kahn Swick and Foti, LLC, to pursue such action on a contingent fee basis.

2.  Plaintiff did not purchase securities of **Duncan Energy Partners, L.P.** at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  During the Class Period, Plaintiff has executed transactions in the securities of **Duncan Energy Partners, L.P.** as follows. See attached Schedule.

5.  In the last three years, Plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.  Plaintiff will not accept payment for serving as a lead plaintiff beyond his/her/its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:      July 25     , 2011

 

                                     Plaintiff Signature

                                John Rinker

                                   Printed Name

**<u>Duncan Energy Partners L.P. Trade Data for John Rinker</u>**

**Purchases**

| Date | Number of Shares | Price |
|------|------------------|-------|
| 1/27/2010 | 500 | $24.56 |

## CERTIFICATION PURSUANT TO SECURITIES LAWS

_ARTHUR HERMAN SPEIER_ ("Plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.  Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and retains the firm of Kahn Swick and Foti, LLC, to pursue such action on a contingent fee basis.

2.  Plaintiff did not purchase securities of Duncan Energy Partners, L.P. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  During the Class Period, Plaintiff has executed transactions in the securities of Duncan Energy Partners, L.P. as follows. See attached Schedule.

5.  In the last three years, Plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.  Plaintiff will not accept payment for serving as a lead plaintiff beyond his/her/its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _7/29/2011_, 2011

_Arthur Speier_
Plaintiff Signature

_ARTHUR SPEIER_

Printed Name

Name of Plaintiff: _ArTHuR Herman Speier_

Schedule of Plaintiff's Transaction(s) in: Duncan Energy Partners, L.P.

Purchase(s):

| Date | Units | Price |
| --- | --- | --- |
| Bought 5/6/2008 | 1000 | 19.50 |
| Sold 12/22/2010 | 1000 | 31.8196 |
| Bought 12/23/2010 | 1450 | 31.8941 |